***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, rehear the parties or their representatives or amend the Opinion and Award, except for modifications regarding temporary partial disability compensation and sanctions.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing and following, and in a Pre-Trial Agreement admitted into evidence as
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and the subject matter.
2. At all times relevant to this claim, an employer-employee relationship existed between Daniel Zbytniuk and ABF Freight Systems, Inc. (formerly Cardinal Freight Carriers).
3. Plaintiff sustained an injury by accident on May 13, 1997 while in the course and scope of his employment with defendant-employer.
4. On May 13, 1997, the average weekly wage of the plaintiff was $852.92, yielding a compensation rate of $512.00 per week.
5. Pursuant to a Form 21 executed by the parties on June 25, 1998, temporary total disability benefits were paid to the plaintiff from June 13, 1997 through September 17, 1997.
6. The entire contents of the North Carolina Industrial Commission file are entered into evidence, specifically including, but not limited to, all completed North Carolina Industrial Commission forms, without further identification or proof.
7. The parties stipulated into evidence plaintiff's medical records including medical records from the following: Pinehurst Surgical Clinic; Moore Regional Hospital, Pinehurst Rehabilitation Center; Mark E. Brenner, M.D.; Sandhills Center for Mental Health, Developmental Disabilities, Substance Abuse Services; John Umstead Hospital; Pinehurst Neurology; First Health Pain Management Clinic; David H. Williams, Ph.D; First Health Family Care Center; First Health of the Carolinas Behavioral Unit; David Ruck, M.D.; Duke University Medical Center; Dr. Laurence Higgins.
8. At all relevant times herein, defendant-employer was an approved self-insured for workers' compensation.
9. The depositions and records of David Harold Williams, Ph.D., Verne G. Schmickley, Ph.D. and Dr. Mark E. Brenner have been received into evidence.
10. The issues for decision by the Commission at this time are whether the plaintiff's current conditions are related to his original compensable injury and to what further benefits and/or medical treatment plaintiff is entitled as a result of his May 13, 1997 compensable injury.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was a 41-year old male. Plaintiff's educational background consists of a GED, a partial semester of college level courses, and a certificate from truck driving school. Plaintiff has been working full-time as a long haul truck driver since the age of twenty-one up until the date of the injury on May 13, 1997, at which time he was almost 37 years old.
2. Plaintiff began working for defendant-employer on January 9, 1992 as a long haul truck driver.
3. On May 13, 1997, plaintiff sustained a compensable injury to his right knee arising out of and in the course of his employment with the defendant-employer while removing a pin from the bed of one of his trucks in Atlanta, Georgia. Prior to May 13, 1997, plaintiff had no history of significant right knee or psychological problems.
4. Although in pain, plaintiff was able to drive back to North Carolina following the accident. Plaintiff initially sought treatment at the Moore Regional Hospital Emergency Department. On May 26, 1997, plaintiff presented to Ward S. Oakley, M.D. After attempts at conservative treatment failed, Dr. Oakley performed arthroscopic knee surgery on June 19, 1997, when he determined that plaintiff did not have a medial meniscus tear, but diagnosed patellar chondromylacia of the right knee.
5. As a result of his knee problems, plaintiff was unable to work during the period from June 17, 1997 to September 17, 1997, during which time plaintiff was paid temporary total disability compensation pursuant to a Form 21 agreement. Then he was released to return to work without restrictions. Plaintiff in fact returned to work for defendant-employer on September 17, 1997. Thereafter, Dr. Oakley rated plaintiff as having a 5% permanent partial disability of the right leg and pursuant to a Form 26 defendant paid plaintiff compensation for the 5% permanent partial disability of his right knee.
6. Plaintiff returned to work and continued to work in his same pre-injury job at the same pre-injury wages for five months from September 17, 1997 until February 27, 1998 when he voluntarily quit. Plaintiff left defendant-employer to begin work for Ronnie Ring Pinestraw in March 1998 where he continued to work through the remaining ten months of 1998, and all of 1999, except for two months and until late October 2000. Plaintiff's job at Ronnie Ring Pinestraw was essentially the same as his pre-injury job. Plaintiff drove tractor-trailer trucks of varying sizes for four to five hours a day. He also maintained the trucks and worked in the office.
7. Following the administration of a series of cortisone shots, plaintiff was referred in March 1999 by Dr. Oakley to Mark Brenner, M.D., plaintiff's current authorized treating physician. Following a period of conservative treatment during which time plaintiff's complaints of pain continued, Dr. Brenner recommended a second arthroscopic right knee surgery to remove softened cartilage behind plaintiff's kneecap and to treat synovitis in the knee.
8. The second arthroscopic knee surgery, which was necessitated because of the compensable knee injury, was performed by Dr. Brenner on August 2, 1999. As a consequence of surgery, plaintiff was unable to work and earn wages from July 19, 1999 until September 13, 1999, at which time, Dr. Brenner released plaintiff to return to full duty work with no restrictions. In fact, plaintiff immediately returned to work for Ronnie Ring Pinestraw.
9. In December 1999, plaintiff also began working for Pate Derby Trucking in addition to continuing his employment with Ronnie Ring Pinestraw working a total of sixteen hours a day. Plaintiff worked for Pate Derby Trucking until March 2000 when he left for reasons unrelated to his knee.
10. From August 30, 1999, when plaintiff last saw Dr. Brenner, until May 3, 2000 plaintiff did not seek medical treatment for his right knee pain. However, plaintiff returned to Dr. Brenner on May 3, 2000 because after an initial period of improvement he was continuing to have right knee pain. At this time, Dr. Brenner agreed that plaintiff's knee condition was deteriorating. At his deposition in February 27, 2002, Dr. Brenner issued in retrospect plaintiff an increased permanent partial rating of 12% of the leg. He also stated that he would have imposed restrictions at that time if he had been asked. However, these restrictions were given in hindsight and are not consistent with contemporaneous medical records as well as plaintiff's activities.
11. The greater weight of the evidence is that any decrease in wages from September 13, 1999 to October 31, 2000 was not as a result of plaintiff's knee injury.
12. Plaintiff initially claimed that his back problems were related to his compensable knee injury. However, in his deposition Dr. Brenner clearly states, and it is so found, that plaintiff's back condition is not related to plaintiff's compensable knee injury.
13. Further, plaintiff initially claimed that his liver condition was related to the medications for his compensable knee injury but plaintiff has not pursued this claim and it is found that his liver condition is not related to his compensable knee injury.
14. Plaintiff continued to work following his second arthroscopic surgery and release by Dr. Brenner as of September 13, 1999. However, in October 2000, plaintiff began to manifest symptoms of depression. As a result, plaintiff sought treatment at the Sandhills Center for Mental Health, Developmental Disabilities, Substance Abuse Services on October 3, 2000 and on October 27, 2000. Prior to October 2000, plaintiff had neither sought nor received psychiatric or psychological treatment.
15. During his initial evaluation at Sandhills Center for Mental Health, Developmental Disabilities, Substance Abuse Services, plaintiff gave a history of having sustained a knee injury in 1997 and having continued to suffer severe pain from that injury. Plaintiff reported feelings of worthlessness and irritability and a decreased enjoyment and interest in his daily activities due to his persistent knee pain. He reported that he feared losing his job because of knee problems. Plaintiff was diagnosed with major depressive disorder and determined plaintiff's depressive symptoms to be a result of his compensable knee injury.
16. Plaintiff attempted suicide by carbon monoxide poisoning on October 31, 2000. Plaintiff's suicide note expressly attributed his attempt to his right knee injury, the effect it had on his life, his frustration with his inability to heal, and his mistreatment by the defendant-employer. Plaintiff had continued to work until October 31, 2000.
17. Following his suicide attempt, plaintiff was committed to John Umstead Hospital, where plaintiff's psychological problems were determined to be secondary to his chronic right knee pain, his decreased ability to be active, and his inability to hold his previous line of work as a result of his right knee injury.
18. After his discharge from John Umstead Hospital on November 13, 2000, plaintiff continued treating with Sandhills Mental Health Center. Until May 2002, plaintiff saw a social worker once a month and a psychiatrist once every three months. However, despite these ongoing treatment efforts, on May 3, 2002, plaintiff presented to Sandhills Mental Health Center with homicidal and suicidal ideation with a plan to cut his wrists. Dr. Millet admitted plaintiff to First Health of the Carolinas Behavioral Unit for in-patient treatment, after determining that several trials of antidepressants had been ineffective at treating plaintiff's psychological condition.
19. At First Health on May 3, 2002, plaintiff was treated by Dr. David Ruck, a psychiatrist. Dr. Ruck noted plaintiff's persistent suicidal thoughts and diagnosed plaintiff with severe depression that was a direct and proximate result of plaintiff's compensable right knee injury on May 13, 1997. Dr. Ruck recommended in-patient treatment, including intensive therapy, modification of plaintiff's psychotropic medications, and Electroconvulsive Therapy.
20. Previously, in April 2001, plaintiff was referred by Dr. York, a neurosurgeon, to David Williams, Ph.D., a neuropsychologist, for evaluation of his cognitive problems following his first suicide attempt. David Williams, Ph.D, evaluated the plaintiff on June 19, 2001 and January 18, 2002 and determined that plaintiff's cognitive deficits were not the result of any brain injury from the suicide attempt but were a result of his severe depression caused by chronic pain and physical limitations flowing from plaintiff's compensable knee injury.
21. David Williams, Ph.D., administered among other tests, a Beck Depression Inventory, a Beck Anxiety Inventory and a Minnesota Multi-Phasic Inventory Two. These tests are used by other mental health professionals as tools for the assessment of mental health issues.
22. Defendant has offered the testimony of Verne Schmickley, Ph.D., to rebut the opinions offered by Dr. Millet, Dr. Ruck and David Williams, Ph.D. In his deposition, Verne Schmickley, Ph.D., agreed that plaintiff suffers from severe depression and chronic pain. However, Verne Schmickley, Ph.D. disagreed with Dr. Millet, Dr. Ruck, and David Williams, Ph.D., and denied that plaintiff's depression and chronic knee pain were causally related. However, Verne Schmickley, Ph.D., only saw plaintiff on one occasion, conducted a limited interview of plaintiff, and possessed insufficient knowledge of the facts of the case, including limited knowledge of plaintiff's work history, plaintiff's suicide attempt, and plaintiff's current physical limitations and the effect such limitations have had on plaintiff's mental state. Therefore, Verne Schmickley, Ph.D.'s, testimony on the issue of causation lacks credibility and is given less weight than the other experts.
23. The greater weight of the medical evidence in this case shows that plaintiff suffers from major depression, which is a direct and natural result of his chronic knee pain resulting from his May 13, 1997 compensable knee injury.
24. With regard to the knee, Dr. Brenner testified that in light of plaintiff's difficulty staying in the same position for any length of time, the medications plaintiff requires for his chronic right knee pain, and the fact that plaintiff's knee locks on occasion, plaintiff can never return to his pre-injury employment and is incapable of earning wages which he was receiving at the time of his compensable injury at the same or in any other employment.
25. Subsequent to October 31, 2000 defendant has not offered plaintiff suitable employment and plaintiff has not obtained employment.
26. Plaintiff has not yet reached maximum medical improvement with regard to his compensable knee injury or with regard to the psychological condition that is a direct and natural consequence of plaintiff's compensable knee injury.
27. As a result of plaintiff's compensable knee injury and subsequent depression, plaintiff had total loss of wage earning capacity as of October 31, 2000 and continuing.
28. As a direct and proximate result of plaintiff's compensable knee injury and his psychological condition, which flowed from his compensable injury, plaintiff will require additional and future medical treatment.
29. There were substantial questions of both law and fact in this matter and the defense of this action was reasonable.
 ***********
Based on the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Upon approval by the Commission of a Form 21, Agreement for Compensation, the employee receives the benefit of a presumption that he is totally disabled, and his initial burden of proving a disability is therefore relieved. Franklin v. Broyhill Furniture Industries,123 N.C. App. 200, 205, 472 S.E.2d 382, 386 (1996). Once disability is proven, there is a presumption that it continues until the employee returns to work at wages equal to those he was receiving when the injury occurred. Watkins v. Central Motor Lines, 279 N.C. 132, 137,181 S.E.2d 588, 592 (1971); Watson v. Winston-Salem Transit Authority,92 N.C. App. 473, 476, 374 S.E.2d 483, 485 (1988).
2. Since plaintiff returned to work and worked five months, without restrictions for defendant-employer, as of September 17, 1997, in his pre-injury position and at his pre-injury wages, plaintiff is not entitled to a continuing presumption of disability for the period from February 27, 1998 to July 19, 1999, when he was taken out of work by a physician. Because plaintiff returned to work for five months in his previous position with defendant-employer, which was suitable at that time at wages equal to those he was receiving before his injury and then voluntarily left on February 27, 1998, the presumption of continuing disability after February 27, 1998 was rebutted. Watson, 92 N.C. App. at 476,374 S.E.2d at 485; Watkins, 279 N.C. at 137, 181 S.E.2d at 592. Further, plaintiff has not proven that any decrease in wages for the period from February 27, 1998 to July 19, 1999 was as a result of his knee injury.
3. Plaintiff underwent on August 2, 1999 a second arthroscopic surgery on his right knee that was related to his compensable knee injury. As a result plaintiff was temporarily and totally disabled from July 19, 1999 until September 13, 1999 when he returned to his regular work at Ronnie Ring Pinestraw. Plaintiff is entitled to temporary total disability compensation from the period between July 19, 1999 to September 13, 1999. N.C. Gen. Stat. § 97-29. Stamey v. N.C. Self-Insurance GuarantyAssoc., 131 N.C. App. 662, 507, S.E.2d 569 (1998).
4. As a result of plaintiff's compensable injury to his right knee, his knee condition began to deteriorate as of May 5, 2000. This deterioration worsened plaintiff's mental condition and led to plaintiff's attempted suicide. The worsening of plaintiff's knee pain and his increased degree of impairment, which led to his depression, constitutes a material change in plaintiff's condition as of October 31, 2000. N.C. Gen. Stat. §97-47. Blair v. American Television Communications Corp.,124 N.C. App. 420, 477 S.E.2d 190 (1996).
5. Plaintiff has not yet reached maximum medical improvement of his compensable knee injury. N.C. Gen. Stat. § 97-31.
6. Based on the greater weight of the medical evidence, plaintiff suffers from severe psychological problems including depression with occasional homicidal and suicidal ideation, which is a natural and direct consequence of his compensable knee injury and the resulting chronic knee pain. N.C. Gen. Stat. § 97-2(6). The testimony of David Williams, Ph.D., with respect to the mental health assessment tools he used to evaluate plaintiff, meets the standards of the test for untried scientific theories or techniques as stated in Daubert vs. Merrell DowPharmaceuticals, Inc., 509 U.S. 570 (1993). The testimony of Dr. Ruck and Dr. Millet, plaintiff's treating psychiatrists are given greater weight than Dr. Schmickley who only saw plaintiff one time.
7. Plaintiff has not yet reached maximum medical improvement of his psychological condition, which was a natural and direct consequence of plaintiff's compensable knee injury. N.C. Gen. Stat. § 97-31.
8. Because of plaintiff's compensable knee injury and his psychological condition which is a direct and natural consequence of plaintiff's injury, plaintiff has been unable to obtain suitable employment from October 31, 2000 and continuing and is entitled to temporary total disability compensation at the rate of $512.00 per week from October 31, 2000 and continuing. N.C. Gen. Stat. § 97-29. Stamey v. N.C.Self-Insurance Guaranty Assoc., 131 N.C. App. 662, 507, S.E.2d 569 (1998).
9. To the extent that the same is reasonably designed to effect a cure, give relief or lessen the period of disability, defendant-employer shall pay all past and future medical expenses incurred by plaintiff as a result of his compensable injury. Plaintiff's past and future psychiatric treatment is included, but treatments for the back or liver conditions are excluded. N.C. Gen. Stat. § 97-2(19); Reinninger v. PrestigeFabricators, Inc., 136 N.C. App. 255, 523 S.E.2d 720 (1999).
10. Plaintiff has failed to prove that his back and liver conditions are causally related to his compensable injury to his right knee. N.C. Gen. Stat. § 97-2(6).
11. This claim involved substantial questions of both law and fact and the hearing of this matter was not unreasonably defended, and therefore no attorney's fees should be assessed pursuant to N.C. Gen. Stat. §97-88.1.
 ***********
The foregoing stipulations, findings of fact and conclusions of law engender the following:
 AWARD
1. Plaintiff's claims for his back and liver conditions are DENIED.
2. Defendant shall pay temporary total disability compensation to plaintiff at a rate of $512.00 per week from July 19, 1999 until September 13, 1999, if not previously paid, and from October 31, 2000 and continuing until such time as plaintiff returns to work earning the same or greater wages as he was earning at the time of his injury or until further Order by the Commission. Portions of this amount have accrued and shall be paid in a lump sum subject to an attorney's fee approved herein. Defendants are entitled to a credit against this recovery for all sums paid to plaintiff for the 5% permanent partial disability rating of the right leg that defendants paid in June 1998.
3. Defendant shall pay all past and future medical expenses incurred by plaintiff as a result of his compensable right knee injury and his psychological condition to the extent the same is reasonably designed to effect a cure, provide relief or lessen the period of disability, including plaintiff's psychiatric treatment. Treatment for plaintiff's back condition and his liver condition are excluded from this award.
4. An attorney's fee of twenty-five percent (25%) of the amounts due plaintiff under this Award is hereby approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the amounts due shall be deducted from said amount and paid directly to plaintiff's counsel. Thereafter, every fourth check due plaintiff shall be paid directly to plaintiff's counsel.
Defendants shall pay the costs of the action.
This the 8th day of August 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN